**STATE of South Dakota, Plaintiff
and Appellee,**

v.

**Todd Micheal MILLER, Defendant
and Appellant.**

No. 15396.

Supreme Court of South Dakota.

Argued Nov. 16, 1987.

Decided Aug. 3, 1988.

Rehearing Denied Sept. 7, 1988.

Mark Smith, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Roger A. Tellinghui-

sen, Atty. Gen., Dennis R. Holmes, Asst. Atty. Gen., Pierre, on brief.

Drew C. Johnson of Maloney, Kolker, Fritz, Hogan & Johnson, Aberdeen, for defendant and appellant; Greg L. Peterson of Bantz, Gosch, Cremer, Peterson & Oliver, Aberdeen, on brief.

HENDERSON, Justice.

## PROCEDURAL HISTORY

Defendant Todd M. Miller (Miller) was arrested on May 14, 1985, in connection with events surrounding the disappearance of Michael Kinney (Kinney), whose shot and bludgeoned corpse was subsequently found in an abandoned icehouse located in Brown County. After a six-week jury trial held in the circuit court for Brown County, Miller was convicted of first-degree murder, kidnapping, possession of ransom money, and forgery. The trial court sentenced him to two terms of life imprisonment (murder/kidnapping), a fifteen-year term (possession of ransom money), and a five-year term (forgery). The sentences were to run concurrently. Miller appeals his convictions alleging trial court errors in the following regards:

1) Admission into evidence of items seized pursuant to three search warrants;

2) Production of handwriting samples compelled under a grand jury subpoena;

3) Denial of his motion for change of venue;

4) Hypothetical questioning by the State during voir dire;

5) Sufficiency of evidence to support the murder and kidnapping convictions;

6) Denial of his motion in limine concerning hair and fiber evidence;

7) Admission of expert testimony provided by a "forensic anthropologist" on behalf of the State; and

8) The trial court's use of aiding and abetting jury instructions in the ab-

sence of such language in the indictment.

We affirm each conviction.

## FACTS

On the morning of May 8, 1985, Kinney left the home he shared with his mother, Mrs. Sandra McNeil, to attend classes at nearby Northern State College in Aberdeen. He never returned.

The next morning, while driving to town, Mrs. McNeil spotted Kinney's car parked on a side road near their home. The car was locked, with Kinney nowhere in sight. After searching the area without results, she became worried and contacted the Sheriff's Department.

At approximately 9:00 a.m. on May 10, Mrs. McNeil received a telephone call from an unidentified man. The caller told her that she should go to a phone booth in an Aberdeen bar and retrieve an envelope from under the pay phone, if she wanted to know what had happened to her son. Mrs. McNeil did so, and found a ransom note demanding $200,000 in exchange for her son. Police agents then secured $190,000 from local banks and took the money to the McNeil residence.

Mrs. McNeil received a second telephone call three days later, in which she was instructed to leave the money near a statue in an Aberdeen park at 9:00 p.m. that night. The caller informed her that Kinney was "okay," and was wearing Nike shoes and jeans, but refused to let her speak to Kinney until "I get the money."

The money was delivered as the caller had directed. Miller picked up the briefcase containing the money and drove off in a blue Oldsmobile, unaware that he had been observed by federal, state, and local law enforcement agents. These agents had previously placed a radio tracking device under a false bottom in the briefcase containing the money. Led by the beeper, the agents followed Miller across the state border to Starbuck, Minnesota, where they stopped his car at a roadblock and arrested him. Prior to the stop, the car attained varying high speeds in excess of 85 miles per hour. Miller had, before leaving Aber-

deen, changed clothes, switched to an orange Camaro and picked up his seventeen-year-old sister Paula.

At the scene of the arrest, the briefcase was found in the Camaro, which briefcase contained most of the ransom money. Found in Miller's wallet was $862, $760 thereof identified by serial numbers as bills which had been part of the ransom. Miller initially said that the money in his wallet was $500 which he withdrew from his bank account. When advised that there was more than $500 in the wallet, he told the officers the money was given to him by a Mr. Bob Jacobs, as traveling money.* This Mr. Jacobs was supposedly going to buy a horse from Miller in Alexandria, Minnesota. During this conversation, Department of Criminal Investigation (DCI) Agent Douglas Lake asked Miller where "Mike" was. He responded, "I wouldn't hurt Mike *McNeil.* He's my best friend." (Emphasis supplied.) Up to that point, none of the agents had mentioned Kinney's last name. Miller did not, at this time, say that Kinney was in any danger or was involved in an extortion plot.

Agent Lake turned Miller over to two members of the Aberdeen Police Department. Miller told these officers that Bob Jacobs, a casual acquaintance, had asked him to pick up a package behind the statue in the park, and deliver it to Jacobs in Alexandria, Minnesota, in exchange for which Jacobs would buy a horse from him for $45,000. Miller speculated that Jacobs was involved with drugs.

The officers suggested that his story seemed untrue, and, as they were interested in saving Kinney's life, this was a time to be truthful. Miller then told them that Jacobs had instructed him, by telephone, to call Mrs. McNeil and deliver the envelope to the bar. If Miller refused, he would never see "his friend" again, he told the officers. He claimed he later received a second call from Jacobs, in which Jacobs threatened Miller's newborn child. According to Miller, he was to pick up the money and take it to an Alexandria motel. This

was Miller's third explanation of the events at issue.

Miller was taken to the motel by the FBI. The next morning, Miller was set out as a decoy at a predetermined time and place, but no Mr. Jacobs materialized.

Miller was then taken back to Aberdeen, where he was held in custody until May 23, 1985. FBI Agent Adrian Mohr interviewed Miller on May 16, at which time Miller related a new, different story, as follows: On May 7, the evening after his son was born, he was celebrating the birth in an Aberdeen bar with some friends. Around 11:00 p.m., he left the bar. He was approached by two individuals, a white man and an Indian, who pulled him into an alley and asked him for a favor, at which point the white man punched him in the stomach. The white man made a veiled threat against Miller and his baby, then the two strangers let him go. Miller went home. A man, whose voice Miller identified as that of the unknown white man, called Miller on May 9, and instructed him to take a note from his mailbox and deliver it to Mrs. McNeil, or Kinney and Miller's baby would be killed. The caller told Miller that Kinney was wearing blue jeans and Nikes. Miller did as he was told, in the process making the May 10 call to Mrs. McNeil. On May 12, Miller received another call from the unidentified white man. He was given instructions regarding the ransom money, which he relayed to Mrs. McNeil. Miller was promised "some money" if he followed orders. As a cover story to explain his trip to Minnesota, Miller told Mohr, he made up the horse tale. After gathering up the ransom money, he went to an Aberdeen bar and tried to recruit a friend, Toby Whittlinger, to join him on his trip. Toby declined, so he called his sister Paula, who went along.

Two days later, on May 18th, Miller related still another story (the fifth) to Agent Mohr: Kinney had initiated the whole thing, and enlisted Miller in an extortion scheme. This scheme required Miller to call Mrs. McNeil and pick up the ransom. Miller suggested the Alexandria motel ren-

---

* The admissibility of Miller's numerous statements is not contested in this case.

dezvous. Kinney indicated that he was in some kind of trouble, which Miller assumed was drug related. On May 7, Miller told Kinney he was backing out. The next day, according to Miller, he received a call from an unknown man with a deep voice. This person informed him that he had to follow through with the plan, or his baby would be killed. Miller admitted that he had written the ransom note and made the calls to Mrs. McNeil. On May 12, the man called again and said: "Do as you're told, nobody else is involved, and nobody gets hurt." Despite this warning, after picking up the money, Miller took his younger sister with him, apparently for protection as, he said, "There's safety in numbers."

Partly as a result of this interview, a warrant for Kinney's arrest was issued. The investigators also found an eyewitness who claimed to have seen Kinney in the motel at Alexandria on the evening of May 13, and had received an anonymous phone tip from a woman who indicated that the kidnapped man could be found at an abandoned farm southeast of Aberdeen. The tip triggered a search in a five- to six-mile radius of Aberdeen, but results were negative.

On May 28, 1985, a farmer found Kinney's badly decomposed body in a derelict icehouse seven miles west of Aberdeen. Kinney's body bore evidence of three .22 caliber bullet wounds and head injuries apparently inflicted with a square-edged instrument. The doctor who performed the autopsy estimated that either set of wounds could have been fatal but that a gunshot wound to the aorta was the actual cause of death. The corpse was in a partially mummified state and showed no signs of having been tied up. Samples of stomach contents were taken which, when analyzed, included part of an olive and degenerated vegetable matter and meat fibers which were consistent with Kinney's last known meal, a pizza topped with pepperoni, sausage, mushrooms, and olives, consumed on May 8, at approximately 6:30 p.m. The doctor testified that normally food passes through the stomach in four to six hours, with some variation. He also opined that Kinney had been dead for two to three weeks, although that estimate was "very rough."

The decomposed, maggot-ridden body appeared to have been dumped in the icehouse, with no indication that Kinney had been killed there. Dr. Rodriguez, a forensic anthropologist, estimated that the body was in the icehouse for eighteen to twenty days, although this was bitterly disputed by the defense. The defense's experts opined that Kinney had possibly been killed in a southern state, as the type of maggots in and around the body were from a type of blowfly found farther south at that time of year. This testimony, however, was premised on studies that had not been updated since 1949.

At trial, testimony was offered to the effect that Miller's father, Martin, was in severe financial difficulty, and had written checks totaling $23,420.10 which were returned for insufficient funds in the first half of 1985. Miller was aware his father had financial trouble, and had discussed a horse sale with his father, saying that he would have the money on May 14, 1985. Martin had a land payment due on that same day, and intended to make the trip to the bank after Defendant Miller returned with the proceeds of the sale. In addition, Miller's sister, Paula, testified that Miller did not indicate he was in any sort of trouble during their ride to Starbuck. She conceded that she "probably" told the grand jury that Miller wanted to get money to help his father make a land payment.

Miller offered evidence that Kinney used marijuana regularly and dabbled in other drugs. In June 1984, Kinney had once mentioned to a girl friend that he wanted to leave Aberdeen and go to Canada. He speculated that he could raise money for this exodus by forging a bank document. The girl friend noted, however, that Kinney had no money problems. Other witnesses testified that Kinney already had access to Mrs. McNeil's bank accounts.

Hair, fiber, and blood taken from the trunk area of the Oldsmobile matched samples taken from Kinney's body and clothing, though the blood from the car was too

badly deteriorated for analysis to be absolutely conclusive. In addition, a live .22 caliber round was removed from Miller's Camaro. The .22 caliber bullets in Kinney's body could not be matched to the round from the car, however, as they were deformed on impact.

Other evidence demonstrated that Miller's handwriting matched that on a forged check drawn on Kinney's bank account after his disappearance. An eyewitness placed Miller at the convenience store where the check was passed. Kinney's checkbook, which he was carrying the night he vanished, was never found.

The jury found Miller guilty of first-degree murder, kidnapping, possession of ransom money, and forgery, all of which are appealed. We note there are approximately 2,800 pages of trial transcript, 193 trial exhibits, numerous transcripts of motion hearings, 220 pages of briefing, and three supplemental briefs. All have been exhaustively reviewed. We condense this to a *14*–page opinion, in affirming all convictions.

## DECISION

### I. SEARCH WARRANTS

Before trial, Miller sought to suppress evidence acquired through searches carried out via three search warrants: 1) a warrant dated June 17, 1985, authorizing search of the Martin Miller ranch and vehicles owned by Miller's father, and his wife, Cindy; 2) a warrant dated July 3, 1985, authorizing search of Miller's Camaro and the Oldsmobile used by the Millers; and 3) a warrant dated August 2, 1985, authorizing search of Miller's residence and that of his father-in-law for bank checks drawn on Miller's account and any writings containing the words "Mike" or "Michael Kinney." As the errors alleged by Miller regarding these searches and the corresponding warrants are numerous, each warrant will be considered separately.

Miller assails the June 17 search warrant on the grounds that there was no showing of probable cause on the underlying affidavit, the affidavit and warrant failed to describe the property to be searched with sufficient specificity, and the affiant, by not mentioning a previous FBI search, deprived the issuing judge of information essential to determining the question of probable cause to search. Miller does not urge suppression of physical evidence seized pursuant to this warrant, but seeks to use it to taint the July 3, 1985 search warrant.

We disagree with the first allegation, that probable cause to search the Miller residence and Oldsmobile (the car was, in fact, registered to Miller's father-in-law) was lacking. This Court's determination of whether an affidavit in support of a search warrant shows probable cause for issue of the warrant must be based on examination of the four corners of the affidavit in question. *State v. Iverson*, 364 N.W.2d 518, 522 (S.D.1985). Probable cause, relating to search warrants, is defined as the existence of facts and circumstances that would warrant an honest belief in the mind of a reasonable, prudent man acting on all the facts and circumstances within the knowledge of the magistrate that the property sought exists at the place designated. *Iverson, id.* Every reasonable inference possible should be drawn in order to support the determination of probable cause by the magistrate. *Iverson, id.* In reviewing affidavits, we should not invalidate the search warrants by interpreting the affidavits in a hypertechnical manner; rather, we should read each affidavit as a whole and interpret each in a common-sense and realistic manner. *State v. Kaseman*, 273 N.W. 2d 716, 722 (S.D.1978).

■ The affidavit supporting the June 17 warrant set out, among others, the following facts: 1) The affiant, Agent Lake, directly observed Miller as he picked up the briefcase full of money, at about 10:10 p.m. on May 13, 1985; 2) Lake and other officers followed Miller, via a radio tracking device, to Starbuck, Minnesota, where the arrest took place; 3) at the arrest site, Lake observed that Miller had changed clothes between leaving the park and his arrest; 4) Miller had told police that a) he had gone to his father's residence, changed clothes, switched automobiles, and picked

up his sister Paula during the interval between Lake's observations at the park and arrest site, b) Miller and his wife Cindy lived at his father's residence, c) Miller had driven an Oldsmobile to the park, changed to his Camaro for the trip he was arrested on, and driven his father's pickup truck to the place he made a demand call on Mrs. McNeil; 5) Lake also reported that the lack of evidence at the icehouse indicated Kinney had been killed elsewhere, and dumped at the icehouse.

A better showing of probable cause for a search warrant for the Miller ranch and vehicles is difficult to imagine. Miller's argument that the warrant consisted only of speculation is frivolous.

The assertion that the June 17 warrant lacked specificity and that the subsequent search was an illegal "general search" is likewise unsound. The warrant provides the legal description of the property ("S 15 A of W 20 A and portions of W 40 A, E of W 20 A laying S of Foote Creek, Northwest ¼ 33 124 64 33 acres"). It directed search of the house, barn, and all buildings or enclosures at that location, and "all motor vehicles and trailers owned by Martin and Cindy Miller."

■ Martin Miller, Defendant's father, consented, in writing, to the search of his own ranch. Therefore, describing the property to be searched with particularity has little bearing on our consideration. Regarding the automobiles, the warrant specified only that all motor vehicles and trailers owned by Miller's father and wife were to be searched. The only vehicle searched, under this warrant, relevant to the trial, was the Oldsmobile Miller admitted driving to and from the park when he picked up the money he had demanded from Mrs. McNeil. This vehicle was registered to Miller's father-in-law and primarily used by Miller's wife. The other members of the Miller family also had access to the Oldsmobile, which was located at the premises to be searched. The error regarding ownership is harmless, as the wife had effective control over it. The description in the underlying affidavit (Oldsmobile—used by Miller) provided sufficient particularity, as

identification by make and the name of the operator is sufficient. 2 W.R. LaFave, *Search and Seizure* § 4.5(d), at 224 (1987). A requirement of particularity of description is satisfied if the circumstances surrounding the execution of the search are such that the officer can, with reasonable effort, ascertain and identify the property intended to be searched. *Wangrow v. United States*, 399 F.2d 106, 115 (8th Cir. 1968); *Steele v. United States*, 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757, 760 (1925).

■ Miller's third objection to this search warrant is that Agent Lake, in not mentioning in his affidavit a prior FBI search of the Oldsmobile, knowingly made a false statement, omitted material information, or recklessly disregarded the truth, and the warrant must, therefore, be voided. We disagree. These allegations are unsupported by the record. Agent Lake did not know of the first search. Regardless, Miller insists that knowledge of the FBI search must be imputed to Lake as both Lake and the FBI are police agents, per *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), a Sixth Amendment case. Even if *Jackson* applies, which we do not concede here, this argument collapses when the facts of the present case are examined. The FBI search was cursory, and was undertaken on May 14, 1985, before Kinney's body was found. The scope of the June search was greater, as more evidence had been found. Even had the judge been informed of these circumstances, there would have been ample probable cause to authorize a new search. This Court affirmed the issue of a second warrant in *State v. Kaseman*, 273 N.W.2d 716 (S.D.1978), in similar circumstances where the judge was informed of a previous cursory search.

As the June 17 warrant and June 18 search were legal, no taint attaches to the July 3, 1985 warrant. The only information discovered by the police in the June 18 search, relevant to this appeal, was Lake's observation that the Oldsmobile's trunk carpet had been removed and replaced with a throw rug, the tire iron was missing, and

a white powder was sprinkled in the trunk (Miller's wife testified, at trial, that her mother removed the carpet and spread baking soda to remove a bad smell).

On July 3, 1985, a second search warrant was signed, by a different judge, at Agent Lake's request. This warrant authorized microscopic and chemical examination of Miller's Camaro and the Oldsmobile. The Camaro was identified by color, model, vehicle identification number, license number, and owner. The Oldsmobile was specified by vehicle identification, license number, and registered owner. Hair, fiber, blood, and foreign material was to be sought. Lake's affidavit, in addition to the information from his June 17 affidavit, reported the signs of tampering with the Oldsmobile discovered on June 18. On July 3, the Oldsmobile was seized, taken to a police facility, and what appeared to be bloodstains were found spattered on the trunk lid. Lake sealed the Oldsmobile and the Camaro, which had been in police custody since Miller's arrest, and waited for assistance from the State Forensic Laboratory in Pierre. Rex Riis arrived from Pierre on July 15, 1985, and removed blood samples from the Oldsmobile's trunk, trunk liner, and taillight assembly. On July 29, 1985, Lake vacuumed the trunk of the Oldsmobile, and searched the Camaro, finding a live .22 caliber round. Evidence removed from the vehicles on July 15 and July 29 was admitted at trial.

■ Miller asserts that the same challenges to probable cause, particularity of description, and truthfulness of the underlying warrant mounted against the June search warrant invalidate the July 3 warrant. We reject these contentions. The evidence of tampering, observed during the June 18 search, provided additional probable cause to search. The warrant described the vehicles with particularity and the items to be searched, namely "hair, fiber, blood and foreign material from vehicles"; hence, the sought items were adequately described. The argument that failure to mention the FBI search in the affidavit deprived the issuing judge of material information is even less valid than in the case of the June 17 warrant. In May, the FBI found the trunk neat and well ordered. On June 18, Lake discovered white powder scattered in the trunk and carpeting removed. Comparison of the condition of the trunk during the May and June examinations would only strengthen the showing of probable cause. Failure to mention a prior legal search which would actually aid the determination of probable cause, to a defendant's disfavor, does not render a search warrant invalid. *State v. Biggs*, 113 Idaho 595, 746 P.2d 1054 (1987). Again, Miller failed to show that Lake knew of the earlier search.

Miller also argues that the evidence taken from these vehicles pursuant to the July 3 warrant should have been suppressed because it was taken in violation of SDCL 23A–35–4, which provides that search warrants "shall command the officer to search, within a specified period of time not to exceed ten days...."

■ The ten-day rule is not a matter of constitutional dimensions, as neither the Fourth Amendment nor Article VI, § 11, of the South Dakota Constitution contain such a limit. The constitutions forbid unreasonable searches and seizures, and the constitutional prohibitions have no application on these facts. The time of a search warrant's execution is not a matter of state or federal constitutional law but a matter of statute. *People v. Crispell*, 110 A.D.2d 926, 487 N.Y.S.2d 174 (1985). Statutory omissions in execution of search warrants do not automatically require suppression. *State v. Jackson*, 371 N.W.2d 341 (S.D. 1985); *State v. Glick*, 87 S.D. 1, 201 N.W. 2d 867 (1972). "The reasoning behind the [ten-day] rule is simple; probable cause may well be affected by the passage of time." *Spera v. State*, 467 So.2d 329, 331 (Fla.App.1985). "The purpose of the statutory requirement of timely execution of search warrants is to ensure that probable cause still exists to believe that the items sought by the warrant are in the place to be searched." *People v. Kibblewhite*, 178 Cal.App.3d 783, 785, 224 Cal.Rptr. 48, 49 (1986). *See also Simmons v. State*, 286 P.2d 296 (Okla.Crim.App.1955). Staleness

of probable cause is not present here. The ten-day rule was broken, but the legislative intent behind the rule was not infringed. The letter, not the spirit, of the law was violated. The trial court was correct in not suppressing the evidence acquired.

■ As to the blood, hair, and fiber evidence embedded in the Oldsmobile, such evidence is an integral part of the vehicle itself. *State v. Darwin*, 155 Conn. 124, 145–47, 230 A.2d 573, 584 (1967), *rev'd on other grounds (Miranda)*, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968). Once blood was found, in timely fashion, the vehicle could be seized as evidence of the crime committed. Subsequent examination of evidence to determine its evidentiary value does not constitute a search. *People v. Teale*, 70 Cal.2d 497, 75 Cal.Rptr. 172, 450 P.2d 564 (1969). The Camaro, on the other hand, was seized at the time of Miller's arrest, and its passenger compartment, where the bullet was found, was subject to search even without a warrant if probable cause existed (as was clearly the case here). *State v. Rice*, 327 N.W.2d 128 (S.D.1982). The Camaro could constitutionally be searched later, in police custody, as the probable cause existing at the scene still obtained at the station house. *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975).

■ We expressly disapprove of the issuing judge's alteration of the July 3 warrant to allow the Oldsmobile to be taken into possession for the number of days necessary to complete the search. There is no authority for the judge to abrogate the ten-day rule in such fashion. On different facts, the ten-day rule or constitutional reasonableness concerns might have required suppression.

Miller seeks to invalidate the August 2 search warrant on different grounds, maintaining that it was issued by a judge who had abandoned his neutral and detached status, and because the judge had disqualified himself from the case, the warrant was void.

The first allegation, that the judge had exhibited bias, stems from an incident at the end of Miller's preliminary hearing on the charge of possession of ransom money. Defense counsel had submitted a motion for dismissal on the grounds that there existed no evidence that Kinney was kidnapped, "who I'm speculating disappeared by himself on May 14th." The judge then reviewed the evidence, concluding:

No one in their wildest dreams could imagine that a person could shoot himself a number of times in the chest if he committed suicide and beat himself over the head till he fractured his skull. The evidence is clear that he probably—I mean, that he was kidnapped, the evidence is clear that he was murdered, it all ties back to one person, the defendant. So not only do you have enough evidence, but you have substantial evidence to go to trial. So there's no question that he should be bound over for trial.

And because the evidence is so strong, I'm setting the bond at one half million dollars cash....

A month later, Chief Deputy Imberi requested a search warrant from the same judge. Imberi sought to obtain bank checks and other writings of Miller as part of an investigation of possible fraud regarding one of Kinney's checks being negotiated after Kinney's disappearance. Imberi's affidavit indicated that writing characteristics, on the check in question, were similar to those on Miller's bank records which had been subpoenaed earlier by the Brown County State's Attorney's Office.

■ As a judge does not have to disqualify himself merely on the basis of rulings made in the course of a defendant's case or statements made in conjunction with such rulings, *People v. Prast*, 114 Mich.App. 469, 479–81, 319 N.W.2d 627, 632 (1982), there is no validity regarding Miller's first allegation against this judge. He merely made fair comment on the evidence before him and did not address his remarks to Miller's ultimate guilt or innocence. There is no indication of prejudice or bias, as such. In *United States v. Antonelli*, 582 F.Supp. 880 (N.D.Ill.1984), a judge commented during a bond revocation

hearing that the defendant was "[t]he most viciously antisocial person who has ever come before me." *Id.* at 881. It was held by the district court that bias or prejudice must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case. *Id.* at 881–82. *See also United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778, 793 (1966); 46 Am. Jur.2d *Judges* § 169 (1969). Our examination of the record permits the conclusion that a magistrate would not have refused to sign the warrant, so clear was the showing of probable cause.

█ Miller's second attack on the August 2 warrant is premised on his advocacy that the judge, who signed the warrant, had previously disqualified himself from the case. The record does not support this allegation. A clear reading of the transcripts reveals that an extensive exchange took place between the judge and defense counsel at a motion hearing on July 1, 1985. A fair condensation of this lengthy dialogue is that the defendant was not actually asking the judge to disqualify himself completely. The judge, with the acquiescence of defense counsel, agreed to "withdraw as far as circuit court activity." References in the transcript to "circuit court activity" refer to trial, not action taken as a committing magistrate. Search warrants are issued by committing magistrates. SDCL 23A–35–1. The defendant did not file an affidavit under SDCL 15–12–22 to have the judge disqualified in the action. Therefore, the judge was not disqualified as to the later search warrant which involved different charges. As Miller requested the judge to serve as committing magistrate at the July 2 preliminary hearing concerning possession of ransom money, there is no substance to his claim that the judge was disqualified as to signing the search warrant.

█ If suppressed, the evidence seized pursuant to the August 2 warrant would have made no difference to the jury's decision, as other evidence was overwhelming regarding the forgery charge. Miller was

placed by an eyewitness at the store where the check was passed. The check was negotiated after Kinney's disappearance. The signature on the check misspelled "Michael" as "Micheal," a spelling Miller used for his own middle name. Other bank records were in the State's possession which reflected similarity between Miller's writing and that appearing on the forged check. Error of constitutional dimension may be deemed harmless where the reviewing court finds, absent the error, it is clear beyond a reasonable doubt that the jury would have returned a conviction. *State v. Garritsen*, 421 N.W.2d 499 (S.D.1988); *High Elk v. State*, 344 N.W.2d 497 (S.D. 1984).

## II. FORCED PRODUCTION OF HANDWRITING SAMPLES

█ Consideration of Miller's numerous statutory and constitutional arguments concerning his handwriting samples produced for the grand jury and admitted at trial is unnecessary. As noted immediately above, there was overwhelming evidence on the forgery count. State's handwriting expert had access to the forged check written on Kinney's account and Kinney's bank records. Miller's Selective Service form, marriage license, waivers of rights (containing the errant spelling of "Micheal" which appeared on the check in question), and other writing samples were also in evidence. This mass of writing samples rendered the forced samples surplusage.

## III. CHANGE OF VENUE

Miller's motions for a change of venue, additional peremptory challenges, and a jury survey were all denied below. Miller asserts that prejudicial pretrial publicity made a fair trial impossible in Brown County, established by a showing that all jurors selected knew of the case through media coverage.

█ Press coverage of this case, while extensive, was truthful. We note that the press gave prominent treatment to the early issue of a warrant for Kinney's arrest, an event tailored to fit Miller's theory of defense. "Pretrial publicity alone is not

enough to deny a fair trial or, in other words, to warrant a change in venue." *State v. Luna,* 378 N.W.2d 229, 236 (S.D. 1985) (citing *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1979)). Qualified jurors may have some knowledge of the facts and issues involved without burdening a defendant's Sixth Amendment right. *State v. Bonrud,* 393 N.W.2d 785, 791 (S.D.1986); *Luna,* 378 N.W.2d at 236.

Although the record supports Miller's claim that all the jurors knew of the case beforehand, there is little indication of any bias on the part of the jurors who were selected. Miller emphasizes the voir dire responses of one potential juror, who was excused through the exercise of one of his peremptory challenges, and one actual juror.

 This potential juror stated she had some doubt in her mind Miller was innocent; however, she earlier indicated that she would truthfully try to weigh the evidence and that Miller should get a fair trial. The showing of cause, regarding her, was not so clear that denial of Miller's challenge for cause was unfair. Over forty other jurors were excused for cause, of whose examination no transcript was made. As to the juror on the final jury whom Miller alleges was biased, the only trace in the record is that she felt Miller was in some way involved in the Kinney affair, and in some way had done something wrong. She previously stated that she did not know the extent of his involvement. This is not the factual background upon which reversals are based. The test for determining whether a potential juror should be excused for cause is whether the potential juror can set aside preconceptions and render an impartial verdict. *State v. Hansen,* 407 N.W.2d 217, 220 (S.D.1987); *State v. Muetze,* 368 N.W.2d 575, 585 (S.D. 1985). Mere expression of a predetermined opinion as to guilt during voir dire does not disqualify a juror per se. *Hansen, id.* at 220; *Muetze, id.* at 585. Voir dire examination by defense counsel in this case should be considered in the reflection of *Murphy v. Florida,* 421 U.S. 794, 801–02,

95 S.Ct. 2031, 2037, 44 L.Ed.2d 589, 595–96 (1975):

> In response to a leading and hypothetical question, presupposing a two- or three-week presentation of evidence against petitioner and his failure to put on any defense, one juror conceded that his prior impression of petitioner would dispose him to convict. We cannot attach great significance to this statement, however, in light of the leading nature of counsel's questions and the juror's other testimony indicating that he had no deep impression of petitioner at all. (Footnote omitted.)

The shoe fits. We therefore believe the trial court's occasional interruptions in the midst of similar questioning by defense counsel, another of Miller's allegations of error, was justified.

 We similarly find no merit in Miller's argument that he was prejudiced by the trial court's denial of his request for an expert to perform a jury survey. Granting a motion for a public opinion survey rests within the sound discretion of the trial court. *Bonrud,* 393 N.W.2d at 791. We will reverse that decision only upon a showing of abuse of discretion. *State v. Christians,* 381 N.W.2d 214 (S.D.1986). Voir dire is the better forum for ascertaining the existence of hostility toward the accused. *Bonrud,* 393 N.W.2d at 791. As the "scientific survey" sought repeatedly by Miller consisted of a college class project, out of the control of the court, we find no abuse of discretion.

## IV. HYPOTHETICAL QUESTIONING BY THE STATE DURING VOIR DIRE

 During voir dire, the State asked prospective jurors hypothetical questions as to whether they had ever seen a person that they thought they knew, called out his name, and discovered that the person was actually someone else. This was followed by inquiry into whether they would consider all the circumstances surrounding eyewitness identification testimony or simply unquestioningly accept it. These inquiries, Miller argues, were a tactic used to undermine one of his witnesses in advance. However, both parties

presented eyewitness identification testimony at trial. Latitude allowed to counsel in voir dire of prospective jurors rests largely in the trial court's discretion. *State v. Muetze*, 368 N.W.2d 575, 584 (S.D.1985). Here, questions were asked as to whether the jurors could base their decision on the testimony and evidence and did not concern ultimate issues to be tried. While prospective jurors may not be questioned with respect to hypothetical sets of facts expected to be proved at trial, thus committing them to a decision in advance, they may be subjected to hypothetical questions about their mental attitude toward certain types of evidence. *Hobbs v. State*, 277 Ark. 271, 275–76, 641 S.W.2d 9, 12 (1982) (approving the prosecution's hypothetical probing of juror attitudes toward circumstantial evidence). *See also Hobbs v. Lockhart*, 791 F.2d 125 (8th Cir.1986) (where appellant Hobbs unsuccessfully raised the same issue). Here, where the jurors were not asked for a premature decision on a set of facts, the trial court did not abuse its discretion.

### V. SUFFICIENCY OF EVIDENCE

Miller challenges the sufficiency of evidence supporting his convictions on the kidnapping and murder counts. He suggests that the trial court lacked jurisdiction as there were no facts indicating that crimes were committed in Brown County. These arguments are without merit, as Miller simply recites whatever evidence is most favorable to him and derides unfavorable evidence and inferences therefrom as "speculation."

In determining the sufficiency of evidence on appeal, the question presented is whether there is evidence in the record, which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt. *State v. Banks*, 387 N.W.2d 19, 27 (S.D.1986) (citing *State v. West*, 344 N.W.2d 502 (S.D.1984)). In making this determination, the Court will accept that evidence, and the most favorable inferences fairly drawn therefrom, which will support the verdict. *Banks, id.* The evidence is more than adequate.

Regarding jurisdiction, a similar argument was rejected in *State v. Kaseman*, 273 N.W.2d 716 (S.D.1978) (kidnap-murder, signs of struggle at victim's home, but corpse found in North Dakota). The trial court here, as in *Kaseman*, had jurisdiction.

### VI. DENIAL OF MOTION TO SUPPRESS HAIR AND FIBER EVIDENCE

At trial, hair and fiber evidence was introduced which strongly linked Kinney to Cindy Miller's Oldsmobile. Three types of fibers found on Kinney's clothing matched fibers from the car's trunk. Severed hairs from Kinney's head were also located in the trunk. An FBI expert testified that "it is an extremely strong association between the trunk of this car and the victim, in my opinion, the probability or chance that the victim was not in the trunk of this car is extremely small."

Miller contends that the chain of custody was inadequate, as clothing from Kinney's body was exposed on a rooftop to dry, unattended. We disagree. Unlike the situation in *State v. Herman*, 253 N.W.2d 454 (S.D.1977), where a bag of marijuana was ruled inadmissible due to an unexplained break in the chain of custody, with no testimony as to its safekeeping, there is no such break here. The hair and fiber seized, although not initially analyzed, was sufficiently accounted for during the chain of custody. Concerning the period it was exposed, testimony about the possibility of contamination, backed by testing, was presented to the trial court. No evidence of tampering and little likelihood of access by others was attested to. The trial court has great discretion in regard to the competency of chain of custody evidence. *State v. Moves Camp*, 286 N.W.2d 333 (S.D.1979). Where relatively indistinguishable items susceptible to alteration by mistaken substitution or tampering are offered into evidence, a chain of custody must be shown with sufficient completeness to make it improbable that the original item has been tampered with or altered. *State v. Decker*, 317 N.W.2d 138, 141 (S.D.1982); *State v.*

*Robinette*, 270 N.W.2d 573 (S.D.1978). The State must show with reasonable probability that no tampering or substitution has occurred, but it need not negate every possibility of tampering or substitution. *Decker*, 317 N.W.2d at 141. Mere speculation is insufficient to establish a break in a chain of custody. *People v. LeMasters*, 666 P.2d 573, 577 (Colo.App.1983).

## VII. ADMISSION OF STATE'S FORENSIC ANTHROPOLOGIST'S TESTIMONY

At trial, over Miller's objection, a forensic anthropologist testified for the State. He estimated that Kinney's body had been in the icehouse for eighteen to twenty days, based on his examination of insect larvae removed from the body, and photographs of its state of decay. He earned a doctorate in anthropology eight months before testifying, but had no degree in entomology or zoology. His estimates were extrapolated from the results he personally obtained in a unique study involving exposure of human corpses in various Louisiana locations. No similar experiments have been carried out by other scientists, and the accuracy and applicability of his methods are thus unverified.

■ We note that the field of forensic anthropology is recognized as a scientific discipline whose practitioners have been accepted as experts to testify regarding identification of human remains, *Mangialino v. White Haven Memorial Park*, 132 A.D.2d 970, 518 N.Y.S.2d 532 (1987), and time, place, or manner of death, *State v. Balfa*, 506 So.2d 1369, 1370 (La.App.1987), *cert. denied*, 512 So.2d 436 (La.1987); *State v. Klindt*, 389 N.W.2d 670, 673 (Iowa 1986). *See also People v. Knights*, 166 Cal.App.3d 46, 212 Cal.Rptr. 307 (1985); *Bassett v. State*, 449 So.2d 803 (Fla.1984). Our recent opinion in *State v. Adams*, 418 N.W.2d 618 (S.D.1988), wherein we reaffirmed our adherence to the test set out in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), is determinative of this issue:

> Under this test, before testimony related to a scientific principle or discovery is admissible, the principle "must be sufficiently established to have gained gener-

al acceptance in the particular field in which it belongs." [*Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923).] The necessity for such a determination is obvious. It would be impractical to place upon the trial court the sole responsibility for determining whether a scientific principle is valid. While experienced judges are perhaps better positioned than most laypersons to evaluate complex scientific data, they have not been trained to evaluate scientific principles.

> The *Frye* test does not simply elevate the opinion of the scientist over the layperson in determining the validity of scientific principles. It requires a general acceptance of the principle by those who are best equipped to evaluate—the experts in the particular scientific field. Not every scientist in a given field need embrace the principle, but a significant percentage must do so. Dismissed by some as a rather repugnant form of majoritarian head-counting, *Harper v. State*, 249 Ga. 519, 292 S.E.2d 389 (1982), we perceive the *Frye* test as requiring reasonable and necessary verification. Therefore, we continue to adhere to the *Frye* test as controlling the issue of admissibility of evidence involving scientific principles.

*State v. Adams*, 418 N.W.2d at 620 (footnote omitted). The forensic anthropologist's testimony that his methodology is completely untested by other scientists would necessarily mandate our ruling that his estimate of the time of Kinney's death is inadmissible. The contrast with electrophoresis (*see Adams, id.* at 620–21), a widely used form of testing of documented reliability, is striking.

■ Given his experience and education, the forensic anthropologist's testimony as to the type of instrument used to inflict certain of Kinney's head wounds was, however, admissible. Sufficient foundation existed for that testimony. He testified that the head wounds were inflicted with a square-tipped instrument, consistent with an end of a tire iron. His expertise was based on his experience with head

wounds inflicted in homicide cases in Louisiana.

■ Does this error concerning time of death require reversal? We think not. Kinney's stomach contents, clothing, the hair, fiber, and the coroner's estimate that he had been dead two to three weeks support the verdict, especially when considered in light of Miller's own statements and actions. We deem the inadmissible evidence to be cumulative and nonprejudicial in light of the other evidence concerning the victim's approximate time of death. "Where inadmissible evidence admitted at trial is cumulative only and other admissible evidence supports the result, the cumulative evidence, though inadmissible, is nonprejudicial." *State v. Tribitt*, 327 N.W.2d 132, 135 (S.D.1982). Another factor militating against reversal is: Miller's presence at the time Kinney was murdered need not be established to convict him of murder (*see* Issue VIII below).

### VIII. AIDING AND ABETTING INSTRUCTIONS

Miller was charged as a principal to murder. Miller's last argument centers around the trial court's instructions to the jury that he could be found guilty of murder as an aider and abettor, although no such allegation appeared in his indictment, which, combined with the State's failure to respond to his request for a bill of particulars, he alleges made him incapable of mounting an effective defense. He also asserts he was entitled to a unanimous verdict on a single theory of culpability which the alternative principal/aider and abettor theories prevent. He relies on *State v. Reutter*, 374 N.W.2d 617 (S.D. 1985), and *State v. Alexander*, 313 N.W.2d 33 (S.D.1981), for the proposition that failure to allege aiding and abetting in an indictment is reversible error. Both of those cases involved conspiracies. Aiding and abetting, however, is a separate and distinct crime from conspiracy. *State v. Erickson*, 315 N.W.2d 332 (S.D.1982); *State v. Anderberg*, 89 S.D. 75, 79–80, 228 N.W.2d 631, 634 (1975).

As to substantive crimes other than conspiracy, involving aiders and abettors, the situation is different. The applicable statutes are:

SDCL 22-3-3:

*Any person who*, with the intent to promote or facilitate the commission of a crime, *aids, abets or advises* another person in planning or committing the crime, *is legally accountable, as a principal* to the crime. (Emphasis supplied.)

SDCL 22-3-3.1:

*The distinction* between an accessory before the fact and a principal, and between principals in the first and second degree, in cases of felony, *is abrogated. Any person connected with the commission of a felony, whether he directly commits the act constituting the offense or aids and abets in its commission, though not present, must be prosecuted, tried, and punished as a principal.* (Emphasis supplied.)

SDCL 22-3-5.1:

*An accessory* to the commission of a felony *may be prosecuted, tried, and punished, even if the principal is not prosecuted or tried, and even if the principal was acquitted.* (Emphasis supplied.)

In *State v. Zemina*, 87 S.D. 291, 206 N.W.2d 819 (1973), we explained this statutory scheme (the statutes in effect then, SDCL §§ 23-10-3, -4, and -5, were essentially the same as those above), rejecting an argument, similar to Miller's:

Defendant contends that because the state had charged him with murdering Fernen it was error to allow the state to submit the case to the jury on alternative theories that he had killed Fernen or had aided and abetted his brother Bruce in the killing. He argues that before one can be charged and convicted on a theory of aiding and abetting the commission of an offense the state must first prove that the principal was guilty of the crime in which the defendant aided and abetted.

... As was stated in *State v. Bachelor*, 67 S.D. 259, 291 N.W. 738 [1940]:

"The effect of these two sections of the Code [SDCL 23–10–3 and 23–10–5, supra] is to do away with the necessity, in the prosecution, of any reference to a *defendant as an accessory.* A party who aids and abets another in the commission of a criminal offense is himself a principal in the commission of such offense and is to be tried the same as though he were actually a principal and the record of the conviction of the principal, either by verdict or plea of guilty, is not evidence, prima facie, or otherwise of the guilt of an accessory."

... It is not necessary in an indictment under Federal law to allege that a person is guilty of aiding and abetting, and one may be convicted as an aider and abettor even though he is not charged in that capacity. *United States v. Lugo–Baez,* 412 F.2d 435 [(8th Cir.1969)]; *United States v. Thomas,* 469 F.2d 145 [(8th Cir.1972)].

*Zemina,* 87 S.D. at 300–01, 206 N.W.2d at 823–24 (emphasis added).

Other jurisdictions follow the *Zemina* course. A defendant in Wisconsin, indicted for murder as a principal, rested his case without calling witnesses, and was informed at the instruction conference that the State was asking for a party-to-a-crime instruction:

Whiting argues that he would have called several witnesses to dispute the party-to-a-crime charge had the state notified him in a timely fashion. We find no merit in this argument.

*State v. Whiting,* 136 Wis.2d 400, 411, 402 N.W.2d 723, 728 (Wis.App.1987). Also, *see People v. Hooper,* 50 Mich.App. 186, 190–91, 212 N.W.2d 786, 788 (1973):

[T]he trial court instructed the jury on aiding and abetting, despite the fact that he was not charged, in the information, as an aider and abettor. It is contended now that this procedure resulted in a denial of due process since he was not given notice of the nature of the charges against him.

We do not agree. It is well settled that an aider and abettor may be indict-ed, tried, and on conviction punished as a principal and no denial of due process results from charging an aider and abettor as a principal. *People v. Lamson,* 44 Mich.App. 447, 205 N.W.2d 189 (1972); *People v. Palmer,* 42 Mich.App. 549, 202 N.W.2d 536 (1972); *People v. Dockery,* 20 Mich.App. 201, 173 N.W.2d 726 (1969); *People v. Weatherspoon,* 6 Mich.App. 233, 148 N.W.2d 891 (1967).

The Eighth Circuit Court of Appeals recently rejected the argument that a defendant suffered any prejudice through conviction as either an aider or abettor or a principal in *United States v. Eagle Elk,* 820 F.2d 959 (8th Cir.1987):

Under the sixth amendment, a criminal defendant in federal court has a non-waivable right to a unanimous jury verdict....

In the present case, the jury returned a unanimous verdict finding Eagle Elk guilty under 18 U.S.C. § 2(a), which was quoted in the trial court's instructions. The statute makes an aider or abettor in an offense against the United States "punishable as a principal." Even if the jury was divided on whether Eagle Elk committed the principal crime or aided or abetted in its commission, there can be no question that the illegal act was murder.

*Eagle Elk,* 820 F.2d at 961 (citations omitted).

██ Here, where the defendant's theory of defense, from beginning to end of the trial, consisted of claiming he was operating in the scheme with mysterious strangers, or Bill, or Mike, and this evidence was known before trial started, it is ludicrous to cry "surprise." It was Miller, himself, who factually raised aiding and abetting. Instructions below were in accordance with past precedent in this Court and our statutes. In *State v. Johnson,* 272 N.W.2d 304, 305 (S.D.1978), this Court held: "It is settled law that a conviction may be supported by proof that the defendant was an aider and abettor even though the charging instrument charges him as a principal." *Johnson* was cited with approval by the

**42**

Supreme Court of Vermont in *State v. Jaramillo*, 140 Vt. 206, 436 A.2d 757 (1981).

Similarly, we reject Miller's claim that the State's failure to provide him with a bill of particulars was prejudicial. "On the theory that a bill of particulars is supplied to inform defendant of facts of which he is unaware, the defendant is not entitled to information which is within his own knowledge, which may be gleaned from the accusation itself, or which may be procured through other means readily accessible to him." C. Torcia, 2 *Wharton's Criminal Procedure*, § 355, at 288–89 (12th ed. 1975) (footnote omitted).

AFFIRMED.

All the Justices concur.