STATE of South Dakota, Plaintiff and Appellee,

v.

Will D. WIMBERLY, Defendant and Appellant.

No. 16987.

Supreme Court of South Dakota.

Argued Nov. 26, 1990.

Decided March 20, 1991.

**500**

Sherri Sundem Wald, Asst. Atty. Gen., Roger A. Tellinghuisen, Atty. Gen., on brief, Pierre, for plaintiff and appellee.

Michael J. Butler, Sioux Falls, for defendant and appellant.

WUEST, Justice.

Will Wimberly appeals his conviction of first degree rape.[1] We reverse and remand for a new trial.

On February 18, 1989, around 8:00 or 8:30 p.m., Willie Calvin Jackson (Calvin), Arthur Lee Jackson (A.J.) and Will Wimberly (Wimberly) picked up M.S. at her grandmother's house and went driving around downtown Rapid City, South Dakota. Calvin and A.J. are brothers and both were acquaintances of M.S., a fourteen-year-old 8th grader. M.S. had met Wimberly on a previous occasion, but did not know his name at the time she joined the threesome in the car. While driving around, all four individuals drank beer and gin. M.S. became extremely intoxicated.

Eventually, the foursome went to Calvin's trailer house. M.S. either staggered or had to be carried up the stairs and into the trailer. M.S. testified that she had sexual intercourse with A.J. in one of the bedrooms of the trailer house. The two then returned to the living room and lay down on the couch. Although her recollection of the events which ensued is not precise, M.S. remembered that she was pushed back into one of the bedrooms in the trailer. She next remembered waking up naked, with Wimberly standing over

her, telling her to "shut-up" and striking her in the face. Wimberly then raped her. M.S. remembered that someone was standing at the door of the bedroom while this was occurring, but she could not clearly see this person. After the assault, M.S. begged Wimberly to allow her to go to the bathroom. After being shoved into the bathroom, M.S. put on her clothes. Wimberly then pushed her out the back door of the trailer house. M.S. went to a trailer house which had a light on and requested that someone call the police. She then passed out on the porch of this trailer house. She next remembered being awakened by the police and taken to the hospital by ambulance.

Upon arrival at the hospital, M.S. was interviewed by hospital personnel. Her face was badly bruised, her left eye swollen shut. She had bite marks on her cheek and a large bite mark on her left arm. She explained that someone had sex with her and that she had been beaten. The doctor on duty did a routine rape examination, pursuant to which evidence was collected and placed in a sexual assault kit. M.S.'s clothing was also collected and placed in a bag. Her clothes and the rape kit, once completed, were given to the police.

From their investigation, the police were able to develop three possible suspects to the alleged rape: Wimberly, A.J. and Calvin. From a photographic lineup, M.S. identified Wimberly as the person who raped her. Pursuant to this identification, the police obtained an arrest and search warrant for Wimberly. Wimberly's blood, head and pubic hair, and dental impressions were taken as evidence. Both A.J. and Calvin voluntarily subjected themselves to body searches of their blood and hair. Deoxyribonucleic acid (DNA) testing revealed that Wimberly and A.J. contributed to the semen found in M.S.

On February 22, 1989, a complaint was filed charging Wimberly with rape in the first degree, rape in the second degree and sexual contact with a child under sixteen years of age. On March 1, 1989, a preliminary hearing was held and an order was

1. Mr. Wimberly's appellate counsel, Mr. Michael J. Butler, Esq., was not trial counsel.

entered holding Wimberly to answer for the criminal charges set forth in the complaint. Trial commenced on November 29, 1989, and a verdict of guilty was returned on the charge of rape in the first degree.

Wimberly appeals his conviction and raises four issues:

I. Whether the court erred in granting the State's request for good cause delay pursuant to SDCL 23A–44–5.1;

II. Whether the chain of custody was established to properly admit a vial purportedly containing Wimberly's blood;

III. Whether the trial court properly admitted certain testimony of A.J.; and,

IV. Whether the trial court erred in admitting the DNA test results.

We will set forth additional relevant facts as we discuss each issue. Although we reverse on issue III, we decide the others for purposes of retrial.

### I.

 SDCL 23A–44–5.1 provides:

The prosecution shall dispose of all criminal cases by plea of guilty or nolo contendere, trial or dismissal within one hundred eighty days from the date the defendant has first appeared before a judicial officer on the complaint or indictment. Any period of delay shall be excluded if the trial court finds good cause for the delay. In the event of the prosecution's failure to dispose of the action within the time limit required by this section, the action shall be dismissed.

SDCL 23A–44–5.1 clearly and unambiguously requires the disposition of criminal matters within 180–days unless good cause for delay is shown. *State v. Cooper*, 421 N.W.2d 67 (S.D.1988); *State v. Hoffman*, 409 N.W.2d 373 (S.D.1987). Proof by the defendant that the 180th day has passed establishes a prima facie case for dismissal, and absent a showing of good cause delay, the case must be dismissed. *Cooper*, 421 N.W.2d at 69. A motion for good cause delay must be filed by the State within the 180–day period. *Hoffman*, 409 N.W.2d at 375. What constitutes good cause for delay is a question of law and is fully reviewable by this court on appeal. *Cooper*, 421 N.W.2d at 69 (citing *Hoffman, supra*). *But see State v. Kerkhove*, 423 N.W.2d 160 (S.D.1988) (clearly erroneous standard of review applied).

 Initially, trial was delayed beyond the first trial date of May 8, 1989, for a psychiatric evaluation of Wimberly. On May 15, 1989, a hearing was held to set a new trial date. At the hearing, the State informed the court that Calvin and A.J. were out of the state and it would take approximately twenty to thirty days to serve interstate subpoenas. The State requested trial be set in August 1989, but agreed to proceed to trial in June 1989 if Wimberly would stipulate to the admission of statements previously given by the two missing witnesses. Wimberly refused to so stipulate. Consequently, the court ordered trial be set for June 27, 1989, but with the understanding that if the State had not located the missing witnesses and Wimberly was still unwilling to stipulate to their testimony, the trial would be held August 16, 1989.

On May 31, 1989, the State filed a motion for good cause delay based upon Wimberly's requested psychiatric evaluation, the State's difficulty in locating material witnesses and the trial judge's required attendance at computer training on the date set for trial. A motion hearing was held and the deputy sheriff for Meade County presented a report with respect to his inability to locate the two missing witnesses. He testified that he had enlisted the assistance of the Rapid City Police Department, the Pennington County Sheriff's Office and a Rapid City civil process server in locating the witnesses, but had been unsuccessful. The trial court found this evidence substantiated the fact that the witnesses could not be located. The parties agreed the 180th day of this case was August 23, 1989. The trial court ordered trial to commence on the 180th day and granted good cause delay for those days necessary to complete the trial.

On August 14, 1989, the State filed another motion for good cause delay. The

State again cited its inability to locate material witnesses. A motion hearing was held August 21, 1989, and at the hearing the State requested its motion for good cause delay be amended to include as the basis for delay not yet available DNA test results. The State informed the court that the Division of Criminal Investigation (D.C.I.) crime lab in Pierre, South Dakota, had exhausted its testing capabilities and the tests were inconclusive. It was therefore necessary to forward the evidence to the Federal Bureau of Investigation (F.B.I.) in Washington, D.C. for DNA testing. The State argued the DNA testing was necessary because the tests conducted by the D.C.I. crime lab could not eliminate any of the three suspects as contributors of the semen found in M.S. Pursuant to the State's amended motion, the trial court entered an order granting good cause delay until receipt of the DNA test results from the F.B.I.

On September 18, 1989, Wimberly's counsel withdrew from the case with Wimberly's permission and with the understanding that such withdrawal would entail additional delay. By this time, the State had received the DNA test results. Trial was subsequently held on November 29, 1989.

The burden of showing good cause is on the prosecution. *Cooper*, 421 N.W.2d at 71; *Hoffman*, 409 N.W.2d at 375. Good cause may be found when exceptional circumstances exist. In *Cooper*, 421 N.W.2d at 70, we identified as exemplary of exceptional circumstances (1) unique, nonrecurring events; (2) nonchronic court congestion; and (3) unforeseen circumstances, such as the unexpected illness or unavailability of counsel or witnesses. At the first good cause delay hearing the evidence demonstrated that the State was exercising due diligence in attempting to locate Calvin and A.J. The unavailability of these material witnesses is an unforeseen circumstance justifying delay. Therefore, the trial court did not err in delaying the case beyond the 180th day on this basis.

The State also acted with due diligence with respect to the laboratory testing and analysis of the physical evidence. The State flew this evidence to the crime lab in Pierre. All relevant tests were timely conducted, yet proved inconclusive. Under the circumstances, it was prudent for law enforcement officials to forward the physical evidence to the F.B.I. for examination. We find this to be a unique, nonrecurring event which justifies delay. The State has met its burden of establishing exceptional circumstances which are good cause for the delay of trial and we affirm the trial court on this issue.

## II.

■ Wimberly contends the chain of custody with respect to a vial of blood, proportedly his own, was not established to properly admit the vial into evidence at trial. An adequate foundation for admission of real evidence requires testimony that (1) the object offered is the object which was involved in the incident, and (2) the condition of the object is substantially unchanged. *State v. Herman*, 253 N.W.2d 454 (S.D.1977). Where the offered object is not readily identifiable or distinguishable, or is susceptible to alteration by mistake in substitution, tampering, or contamination, a proper foundation requires testimony tracing the chain of custody of the object with sufficient completeness to render it improbable that the original item has been so altered. *State v. Miller*, 429 N.W.2d 26 (S.D.1988); *State v. Decker*, 317 N.W.2d 138 (S.D.1982); *Herman*, 253 N.W.2d at 457. The State need not negate every possibility of tampering or substitution, but must demonstrate with reasonable probability that no tampering or substitution has occurred. *Miller*, 429 N.W.2d at 39; *Decker*, 317 N.W.2d at 141. Mere speculation is insufficient to establish a break in the chain of custody. *Miller*, 429 N.W.2d at 39. The trial court has broad discretion regarding the competency of chain of custody evidence. *Miller*, 429 N.W.2d at 38.

■ Blood is a clear example of a relatively indistinguishable object susceptible to alteration by mistake in substitution or tampering. Thus, a chain of custody must be shown with sufficient completeness to make it improbable that the blood tube at

issue here was altered. We hold the State has met this burden.

Wayne Steinley, a medical technologist, testified at trial that he withdrew blood from Wimberly on February 22, 1989, in the presence of deputy sheriff Davis. The blood tube admitted into evidence did not have attached to it a seal which Mr. Steinley had previously placed on the tube. Consequently, Mr. Steinley was unable to positively identify the blood tube as containing the blood of Wimberly. However, Mr. Steinley maintains independent records of these procedures and his records indicated he had drawn Wimberly's blood on that date. Furthermore, deputy Davis identified the blood tube as the tube which he received from Mr. Steinley on February 22, 1989. Deputy Davis testified that attached to the tube was a label with his writing on it. This writing noted February 22, 1989, as the day the tube was labeled. The writing also indicated the tube contained the blood of Wimberly. We are satisfied this testimony demonstrates with sufficient completeness that the blood contained in the tube was, in fact, Wimberly's. The State has shown with reasonable probability that no alteration by substitution occurred.

### III.

Wimberly contends the trial court erred in admitting hearsay testimony of A.J. concerning statements Calvin made to A.J. and in admitting the opinion testimony of A.J. as to Wimberly's interaction with girls. We review these contentions separately.

### A.

 With respect to statements made by Calvin, A.J. testified that Calvin called him the day after the incident and said the police had been to the trailer to investigate the alleged rape and that he (Calvin) believed it was Will who raped M.S. Defense counsel strenuously objected that such a statement was hearsay and called for speculation and requested the trial judge to admonish the jury to disregard it. The trial judge overruled his objection. Out of the hearing of the jury, defense counsel moved for a mistrial. The State argued that defense counsel had "opened the door" when cross-examining A.J. Defense counsel questioned A.J. about Calvin's roommate, who at some point during the evening in question returned to the trailer house and then left. After A.J. testified he had not seen Calvin's roommate that evening, defense counsel asked how A.J. knew Calvin's roommate had been there. A.J. responded that Calvin said his roommate had returned. The State argued this line of questioning opened the door to further examination of what Calvin told A.J. about the events of the evening.

We find defense counsel did not open the door in his cross-examination of A.J. Defense counsel's cross-examination referred only to the presence of a third party in the trailer house. At most, such questioning may have opened the door to other statements Calvin made with respect to his knowledge of the events in question, but certainly not his *opinion* as to what had occurred. The State did not assert this evidence was admissible under any exception to the hearsay rule. *See* SDCL ch. 19–16. Consequently, the hearsay evidence elicited from A.J. was erroneously admitted and we must determine whether this constitutes reversible error.

SDCL 23A–44–14 provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." " 'Prejudicial error' is error which in all probability must have produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." [2] *State v. Michalek*, 407 N.W.2d 815, 818 (S.D.1987). *Accord State v. Younger*, 453 N.W.2d 834, 838 (S.D.1990); *State v. Blalack*, 434 N.W.2d 55, 58 (S.D.1988); *State v. Dokken*, 385

---

**2.** The author prefers the prejudicial error test stated in *State v. Davis*, 401 N.W.2d 721, 725 (S.D.1987): "prejudicial error occurs when the appellant establishes that under the evidence the jury might and probably would have returned a *different verdict* if the alleged error had not occurred." Nevertheless, the author employs the test adopted by the majority and stated in *Michalek*.

N.W.2d 493, 498 (S.D.1986). The hearsay testimony of A.J. went to the ultimate issue (whether Wimberly raped M.S.) and was spoken by a suspect to the crime (Calvin). Defense counsel's objection to this testimony was not only overruled without explanation, but the court failed to instruct the jury on how the testimony was to be evaluated. Without any direction, the jury could well have considered this testimony substantive evidence. The credibility of M.S. was called into question by her clouded recollection and her varying and conflicting accounts of the events of the evening. Although the DNA test results confirmed that Wimberly contributed to the semen found in M.S., the credibility of the witnesses was crucial to a finding that M.S. was raped. Thus, the hearsay testimony was not cumulative. The trial court clearly erred by permitting A.J. to testify to Calvin's opinion on this, the ultimate issue. *See State v. Thomas*, 381 N.W.2d 232, 239 (S.D.1986); *State v. Logue*, 372 N.W.2d 151, 156–58 (S.D.1985). In all probability these statements must have had some effect upon the jury's verdict and clearly denied Wimberly his right of confrontation. The admission of the hearsay testimony was not harmless error and we must reverse Wimberly's conviction.

### B.

A.J. testified, from his observations and in his opinion, women did not like Wimberly. This testimony was admitted over defense counsel's objection as calling for speculation. On appeal, Wimberly argues that A.J.'s testimony was inadmissible "other acts" evidence. This argument is without merit. A.J.'s testimony did not refer to any acts of the defendant, but rather, expressed his opinion regarding Wimberly's interaction with women. Such testimony is permissible under SDCL 19–15–1.[3] A trial court is allowed some lati-

tude in admitting testimony. *State v. No Heart*, 353 N.W.2d 43, 48 (S.D.1984). We do not believe the trial court abused its discretion.

### IV.

Wimberly challenges the admission of the DNA test results. The admissibility of DNA profiling in a criminal case is an issue of first impression in South Dakota.[4] The admissibility of scientific evidence such as DNA profiling is governed by the standards set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). *See State v. Miller*, 429 N.W.2d 26, 39 (S.D. 1988); *State v. Adams*, 418 N.W.2d 618, 620 (S.D.1988). Under the *Frye* test, before testimony relating to a scientific principle or discovery is admissible, the principle "must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Adams*, 418 N.W.2d at 620 (citing *Frye*, 293 F. at 1014).

Wimberly does not attack the admissibility of DNA testing under the *Frye* standard. Indeed, a significant number of jurisdictions acknowledge that forensic DNA typing has gained general acceptance in the scientific community. *See, e.g., State v. Schwartz*, 447 N.W.2d 422 (Minn.1989); *People v. Castro*, 144 Misc.2d 956, 545 N.Y. S.2d 985 (1989); *Cobey v. State*, 80 Md. App. 31, 559 A.2d 391 (1989); *Cadwell v. State*, 260 Ga. 278, 393 S.E.2d 436 (1990); *State v. Pennington*, 327 N.C. 89, 393 S.E.2d 847 (1990); *State v. Ford*, 392 S.E.2d 781 (S.C.1990). *See generally* Thompson & Ford, "DNA Typing: Acceptance and Weight of the New Genetic Identification Tests" 75 Va.L.Rev. 45 (1989). DNA testing is routinely preformed and generally accepted for research and diagnostic purposes in many scientific disciplines. *E.g. In Matter of Adoption of Baby Girl S*, 140 Misc.2d 299, 532 N.Y.S.2d

---

3. SDCL 19–15–1 provides:
 If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are
 (1) rationally based on the perception of the witness and

 (2) helpful to a clear understanding of his testimony or the determination of a fact in issue.

4. *See Estate of Erbe*, 457 N.W.2d 867, 872 (S.D. 1990) (Wuest, C.J., dissenting), discussing the use of DNA testing to prove paternity.

634 (Sur.1988) (paternity). We hold DNA analysis meets the *Frye* test.

Although Wimberly does not contend DNA testing has not gained general acceptance within the scientific community, he challenges the admissibility of the DNA profile tests introduced into evidence on the basis that the test results were not reliable. In *Miller*, 429 N.W.2d at 39, we held that the use of an untested methodology of forensic anthropology went to the admissibility of expert testimony based on the methodology, distinguishing *Adams*, 418 N.W.2d at 621 (test methodology goes to credibility of testimony, not admissibility). Wimberly's position is tenuous. A *Frye* hearing was conducted in this case at which the only testimony was that of special agent Adams of the F.B.I. who conducted the DNA analysis admitted into evidence. Adams testified he employed a DNA analysis procedure used throughout the scientific community and supported by public scientific literature.[5] Wimberly did not offer any evidence which would invalidate or put into question the procedures Adams followed in establishing the reliability of the DNA test results. Thus, there is no evidence to support Wimberly's argument and it must fail.[6] *Cf. Cobey*, 559 A.2d at 398.

We affirm the trial court on this issue, but caution that our holding does not "rubber stamp" as admissible DNA test results in all cases.

The admissibility of any such evidence remains subject to attack. Issues pertaining to relevancy or prejudice may be raised. For example, expert testimony may be presented to impeach the particular procedures used in a specific test or the reliability of the results obtained. *See, e.g., People v. Castro*, 144 Misc.2d 956, 545 N.Y.S.2d 985 (1989). In addition, traditional challenges to the admissibility of evidence such as the contamination of the sample or chain of custody questions may be presented. These issues relate to the weight of the evidence. The evidence may be found to be so tainted that it is totally unreliable and, therefore, must be excluded.

*Ford*, 392 S.E.2d at 784. We reverse and remand for a new trial.

MILLER, C.J., and, MORGAN, Retired Justice, concur.

SABERS, J., concurs in part, concurs specially in part and dissents in part.

HENDERSON, J., concurs in part and dissents in part.

AMUNDSON, J., not having been a member of the court at the time this case was argued, did not participate.

SABERS, Justice (concurring in part, concurring specially in part & dissenting in part).

I concur in all respects with issues I, II and IV.

I concur specially in issue III.A because, as stated in *Michalek*, it is simply not clear *beyond a reasonable doubt* that absent the errors here the jury would have returned the same verdict of guilty. *State v. Micha-*

---

**5.** Adams employed restriction fragment length polymorphism (RFLP) analysis in his DNA testing. RFLP analysis involves the following steps:

(1) *Extraction:* DNA is removed from the specimen and "washed" with an organic solvent.

(2) *Fragmentation:* the extracted DNA chain is then cut into fragments at specific sites by mixing it with a restriction enzyme.

(3) *Gel electrophoresis:* the DNA is placed in a gel to which an electrical current is applied, causing separation of the fragments into bands according to their length.

(4) *Southern blotting:* the DNA bands are transferred to a nylon membrane while retaining the same positions they previously occupied on the gel. The double-stranded bands are then treated with a chemical that causes them to separate into single strands.

(5) *Hybridization:* genetic probes (DNA clones) are applied, which bind to a specific, complementary DNA sequence on the membrane; the excess probe is then washed off.

(6) *Autoradiograph:* the membrane is exposed to an x-ray film and developed so that the DNA banding patterns and their lengths can be visualized. Finally, the autoradiograph is interpreted by comparing the DNA print to another DNA sample to determine if they match based on band length.

*Schwartz*, 447 N.W.2d at 425. *See Cobey*, 559 A.2d at 397 for a diagram of this process.

**6.** We are cognizant of *United States v. Two Bulls*, 918 F.2d 56 (8th Cir.1990), but do not believe it is determinative of this issue.

*lek,* 407 N.W.2d at 818–819. *See also United States v. Hasting,* 461 U.S. 499, 510–511, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96, 107 (1983); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–711 (1967). Therefore, in this case, there is prejudicial error.

I dissent as to issue III.B, because it was improper to permit A.J. to give his opinion that "women did not like Wimberly." Stripped of its innuendo, this opinion testimony implies that "if Wimberly had sex, he had to rape to get it because no woman would consent."

Criminal convictions should be based on evidence, *State v. Ashker,* 412 N.W.2d 97, 105 (S.D.1987), not opinion testimony and innuendo. At the very least, the prejudicial effect of this testimony should be carefully weighed against its probative value before it is admitted in evidence. *State v. Klein,* 444 N.W.2d 16, 18–19 (S.D.1989); SDCL 19–12–3, 19–12–4.

HENDERSON, Justice (concurring in part; dissenting in part).

My vote is to likewise reverse this conviction.

Concerning the DNA issue, I would reverse and remand thereby requiring the trial court to hold an expanded pre-trial hearing on the admissibility of the DNA evidence. Under *Two Bulls,* cited in footnote 6 of the majority opinion, five criteria must be met, or should be met, before the trial judge decides to permit the DNA evidence to go before the jury.* In my opinion, these criteria were absolutely not met in this case. Furthermore, it is not a burden of proof to be placed upon the defendant/appellant to offer evidence to invalidate the DNA test result. Rather, it is the State which bears the burden of proof. Therefore, I take legal exception to the

language in the concluding paragraph of the majority opinion. I am not, per se, expressing that the scientific technique called DNA is no good and unreliable; I am expressing that it is a highly prejudicial piece of evidence and that, if it is going to be admitted, it must have a good, solid, sufficient foundational basis to establish its overall admissibility into evidence. *Two Bulls,* at 58. Admission of DNA tests has a powerful impact on a jury. DNA profiling has been the subject of great controversy in the legal and scientific fields. *The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets The Criminal Defendant,* 42 Stan.L.Rev. 465, 479 (1990). Indeed, there is a dark side to DNA profiling, and that is why I would insist that this trial judge follow the five criteria set forth in Eighth Circuit Court of Appeals' Chief Judge Lay's writing in *Two Bulls.* There are several cases expressing that DNA evidence is subject to attack due to resulting prejudice, relevancy and laboratory procedures. *See, State v. Pennington,* 327 N.C. 89, 393 S.E.2d 847 (1990).

"Women did not like Wimberly" should be inadmissible. Such a statement violates SDCL 19–15–1 because it is an opinion which unfairly casts a perception, in the minds of the jurors, which engulfs a true finding of fact.

I agree with majority opinion's treatment of the "good cause" delay under SDCL 23A–44–5.1. I concur that there was no break in the chain of custody on the blood sample, namely issue 2.

---

* The trial court is to decide (1) whether DNA evidence is generally accepted by the scientific community, (2) whether the testing procedures used in this case are generally accepted as reliable if performed properly, (3) whether the test was performed properly in this case, (4) whether the evidence is more prejudicial than probative in this case, and (5) whether the statistics used to determine the probability of someone else having the same genetic characteristics is more probative than prejudicial under Rule 403.